UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

NORMAN SPIEGEL, Derivatively On Behalf of Nominal Defendant CHESAPEAKE ENERGY CORPORATION,

Plaintiff,

v.

AUBREY K. MCCLENDON, RICHARD K. DAVIDSON, KATHLEEN M. EISBRENNER, V. BURNS HARGIS, FRANK KEATING, CHARLES T. MAXWELL, MERRILL A. MILLER, JR., DON NICKLES, and LOU SIMPSON,

Defendants,

- and –

CHESAPEAKE ENERGY CORPORATION,

Nominal Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff, for his verified shareholder derivative complaint, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.

2.     This is a shareholder derivative action brought on behalf of Chesapeake Energy Corporation ("Chesapeake Energy" of the "Company") against the Company's board of directors seeking to remedy their intentional or reckless breaches of their fiduciary duties beginning since at least 2009 to the present (the "Relevant Period").   Plaintiff's allegations are made upon information and belief based on the investigation of his counsel, which included, among other things, review of the Company's public filings with the United States Securities and Exchange Commission ("SEC"), media reports, press releases, and other publicly available documents and information.

3.     Chesapeake Energy was formed in 1989 and engages in the acquisition, exploration, development, and production of natural gas and oil properties in the United States. The Company purports to be the second-largest producer of natural gas, a top-15 producer of oil and natural gas liquids and the most active driller of new wells in the U.S.

4.     The Company's "Founder Well Participation Plan" grants the Company's chief Executive officer, defendant Aubrey McClendon, a 2.5 percent stake in the profits of every well drilled by Chesapeake Energy during each year McClendon participates in the plan.

5.     During the Relevant Period, without full disclosure to the Company's shareholders or other investors, McClendon has personally borrowed approximately $1.1 billion by pledging his stake in the Company's oil and natural gas wells as collateral.  The loans were made through three companies controlled by McClendon that list Chesapeake Energy's headquarters as their address.  Moreover, McClendon's biggest lender is also a major investor in Chesapeake Energy, creating a conflict between the terms of McClendon's personal loans and the Company's financing arrangements with the same lender.

6.     The loan contracts require McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells - including Chesapeake Energy -- "comply with…covenants and agreements" of the loans.  Consequently, as a result of his personal borrowing McClendon is personally subject to loan terms that involve Chesapeake Energy and those terms require McClendon to exercise his rights to the wells on behalf of the lender rather than the corporation that he runs.  Thus McClendon has an incentive to influence Chesapeake Energy to act in the interest of his personal lenders, rather than in the interest of the Company's shareholders.

7.     The truth began to emerge on April 18, 2012, when *Reuters* published a report detailing McClendon's personal borrowing, the magnitude of his loans, and the previously undisclosed terms under which these loans were made.  Citing a February 2011 document detailing a meeting between McClendon's largest personal lender and a prospective investor, in addition to interviews with more than one dozen analysts, academics, and attorneys who reviewed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the loan agreements, the *Reuters* article noted that, among other things, "The size and nature of the loans raise concerns about whether McClendon's personal financial deals could compromise his fiduciary duty to Chesapeake investors."

8.      Following this news, the price of Chesapeake Energy shares fell $1.06 per share, to close at $18.06 per share on April 18, 2012.  Thus, as a result of the Individual Defendants' breaches of their fiduciary duties to the Company they have subjected the Company to substantial losses, adverse publicity, and other occurrences harmful to the Company.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in this District; (2) a substantial portion

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District; and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## PARTIES

12.     Plaintiff is, and was at all times during the Relevant Period, a Chesapeake Energy shareholder.  Plaintiff brings this action derivatively in the right of, and for the benefit of, Chesapeake Energy.  Plaintiff will fairly and adequately represent the interests of Chesapeake Energy and its shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of the State of Connecticut.

13.     Nominal defendant Chesapeake Energy is an Oklahoma corporation with its principal executive offices situated at 6100 North Western Avenue, Oklahoma City, Oklahoma. The Company engages in the acquisition, exploration, development and production of natural gas and oil properties in the United States. The Company's stock trades on the New York Stock Exchange under the symbol "CHK."

14.     Defendant Aubrey K. McClendon ("McClendon") has served as Chairman of the Board and Chief Executive Officer of Chesapeake Energy since co-founding the Company in 1989.  From 1982 to 1989, Mr. McClendon was an independent producer of oil and natural gas. Plaintiff is informed and believes, and thereupon alleges, that McClendon is a citizen of the State of Oklahoma.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

15.     Defendant Richard K. Davidson ("Davidson") has been a member of the Board of Directors since March 2006.  Previously, Davidson served as Chairman of the Board of Directors of Union Pacific Corporation from 1997 until February 2007 and as its Chief Executive Officer from 1997 until February 2006.  Plaintiff is informed and believes, and thereupon alleges, that Davidson is a citizen of the State of Florida.

16.     Defendant Kathleen M. Eisbrenner ("Eisbrenner") has been a member of the Chesapeake Energy Board of Directors since December 2010.  Previously Eisbrenner  served as the head of Houston-based Poten & Partners Project Development Group, a global broker and commercial advisor for the energy and ocean transportation industries.  From 2007 to 2009, Eisbrenner was Executive Vice President responsible for Royal Dutch Shell plc's global LNG business.  Eisbrenner also previously served in various senior leadership positions with other energy companies in the United States, including El Paso Corporation.  Plaintiff is informed and believes, and thereupon alleges, that Eisbrenner is a citizen of the State of Texas.

17.     Defendant V. Burns Hargis ("Hargis") has been a member of the Company's Board of Directors since September 2008.  Hargis has been the President of Oklahoma State University since March 2008.  Previously Hargis was Vice Chairman of BOK Financial Corporation from 1997 to 2008 and is currently a director of BOK, a financial holding company based in Tulsa, Oklahoma.  Plaintiff is informed and believes, and thereupon alleges, that Hargis is a citizen of the State of Oklahoma.

18.     Defendant Frank Keating ("Keating") has been a director of the Company since

June 2003.  Keating has been the President and Chief Executive Officer of the American Bankers Association since January 2011. In 1994, Keating was elected as Governor of Oklahoma and served two consecutive four-year terms.  Plaintiff is informed and believes, and thereupon alleges, that Keating is a citizen of the State of Virginia.

19.    Defendant Charles T. Maxwell ("Maxwell") has been a director of the Company since 2002.  From late 1999 to the present Maxwell has been a Senior Energy Analyst with Weeden & Co., an institutional brokerage firm based in Greenwich, Connecticut.  Plaintiff is informed and believes, and thereupon alleges, that Maxwell is a citizen of the State of New York.

20.    Defendant Merrill A. Miller, Jr. ("Miller") has been a director of the Company since January 2007 and the lead independent director since March 2010.  Miller is Chairman, President and Chief Executive Officer of National Oilwell Varco, Inc., a supplier of oilfield services, equipment, and components to the oil and natural gas industry.  Plaintiff is informed and believes, and thereupon alleges, that Miller is a citizen of the State of Texas.

21.    Defendant Don Nickles ("Nickles") has been a member of the Company's Board of Directors since January 2005. Nickles is the founder and President of The Nickles Group, a consulting and business venture firm in Washington, D.C.  Nickles was elected to represent Oklahoma in the United States Senate from 1980 to 2005.  Plaintiff is informed and believes, and thereupon alleges, that Nickles is a citizen of the State of Virginia.

22.    Defendant Louis A. Simpson ("Simpson") has been a director of the Company since June 2011.  Simpson is the Chairman of SQ Advisors, LLC in Naples, Florida.  Previously

Simpson served as President and Chief Executive Officer, Capital Operations, of GEICO Corporation from May 1993 until his retirement on December 31, 2010. Plaintiff is informed and believes, and thereupon alleges, that Simpson is a citizen of the State of Florida.

23.      Defendants McClendon, Davidson, Eisenbrenner, Hargis, Keating, Maxwell, Miller, Nickles, and Simpson are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.      By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

25.      Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance and management, so that the market price of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's stock would be based on truthful and accurate information.

26.     To discharge their duties, the officers and directors of Chesapeake Energy were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of Chesapeake Energy were required, among other things, to:

a.      Manage, conduct, supervise, and direct the business affairs of Chesapeake Energy in accordance with the laws of the United States, the states in which it conducted business, and Chesapeake Energy's charter and bylaws;

b.      Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of Chesapeake Energy from violating or acting in contravention of all applicable federal and state laws, rules and regulations;

c.      neither violate, nor knowingly permit any officer, director, or employee of the Company to violate, applicable laws, rules and regulations;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing

e.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's

stock;

f.       remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

g.       Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

27.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

28.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

29.     Additionally, the Company has established a Code of Business Conduct and Ethics ("Code") that applies to all employees of the Company.   The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Code.  The Code provides, among other things, the following:

> Chesapeake Energy Corporation and its subsidiaries (collectively, the "Company") are committed to high standards of ethical conduct. Directors, officers and employees of the Company are expected to comply with all applicable laws and to act with honesty and integrity when conducting the Company's business. This Code of Business Conduct and Ethics (the "Code") is intended to be a guide for applying legal and ethical practices to your everyday work and to explain the types of behavior that will help our Company meet its commitment to operate on the highest standards of ethical conduct.

> This Code cannot and is not intended to cover every applicable law or provide answers to all questions that might arise in the performance of your duties. We must rely on your good sense of what is right, including a recognition of when it is appropriate to seek guidance from others as to the proper conduct for a given

situation. Because our business depends upon the reputation of the Company and its directors, officers and employees for integrity and honest business conduct, in many instances this Code goes beyond the requirements of the law.

* * *

**Policy Statement**

*Every director, officer and employee of the Company is required to comply with all applicable laws, regulations and rules of the New York Stock Exchange and to adhere to high ethical standards in the conduct of the Company's business. The standards set forth in this Code are designed to deter wrongdoing by the Company's directors, officers and employees and to promote the following:*

- *Honest and ethical conduct;*

- *Avoidance of conflicts of interest;*

- *Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities Exchange Commission and in other public communications made by the Company;*

- *Compliance with applicable governmental laws, rules and regulations;*

- *Prompt reporting to a person identified in this Code of possible violations of the Code; and*

- *Accountability for adherence to the Code.*

## RELATIONSHIPS WITH BUSINESS PARTNERS AND COMPETITORS

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13

**Conflicts of Interest**

All directors, officers and employees of the Company must avoid situations that create a conflict of interest or the appearance or potential for a conflict of interest. A conflict of interest exists when your personal interests are either in conflict with the Company's interests or interfere with your ability to perform your duties to the Company or responsibilities at work. While conducting the Company's business, you have a duty to act in the Company's best interest.

* * *

It is the Company's policy to identify and acknowledge in writing (in an employment agreement in the case of officers) certain relationships or ownership

interests, and the terms thereof, that are acceptable to the Company but that might

otherwise appear to represent a conflict of interest. Such relationships or ownership interests so acknowledged will not be prohibited by this Code. Any changes to such terms must be promptly reported to and approved by the Sr. Vice President of Human & Corporate Resources; provided that changes to terms set out in an officer's employment agreement may require the approval or waiver by the Board of Directors or the Audit Committee, depending on the materiality and nature of the changes.

* * *

You are expected to recognize situations where a conflict of interest has occurred, or has the potential to occur, and take the necessary actions to eliminate or mitigate such conflict, including, if necessary, enlisting the assistance of management. If you believe a conflict of interest has occurred or cannot be avoided, you are required to disclose such conflict in writing to the Sr. Vice

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

President of Human & Corporate Resources.

**Corporate Opportunities**

You may not personally take for yourself opportunities that are developed

through the use of Company resources, information or position; use Company property, information or position for personal gain, or compete with the Company. You have a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

\* \* \*

**Fair Dealing**

You shall deal fairly and in good faith with the Company, the Company's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others. You shall not take unfair advantage of any of them through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.

\* \* \*

(Emphasis in original).

## SUBSTANTIVE ALLEGATIONS

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

15

30.     Through an unusual corporate incentive known as the "Founder Well Participation Plan," Chesapeake Energy grants its co-founder, Defendant McClendon, a 2.5 percent stake in the profits of every well drilled by the Company during each year McClendon decides to participate in the plan.

31.     Unbeknownst to the investing public, during the Relevant Period McClendon has personally borrowed as much as $1.1 billion in the last three years by pledging his stake in the Company's oil and natural gas wells as collateral.  The loans were made through three companies controlled by McClendon that list Chesapeake Energy's headquarters as their address, and the money is being used to help finance the opportunity for McClendon to buy into the same well stakes that he is using as collateral for these loans.

32.     The loan contracts require McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells -- including Chesapeake Energy -- "comply with…covenants and agreements" of the loans.   Consequently, McClendon is personally subject to loan terms involving the corporation that he runs. Essentially, McClendon has an incentive to influence Chesapeake Energy to act in the interest of his lenders, rather than in the interest of the Company's shareholders.

33.     The truth began to emerge on April 18, 2012, when *Reuters* published a "Special Report" titled "*Chesapeake CEO took $1.1 billion in shrouded personal loans*," detailing the magnitude of McClendon's personal borrowing, the intertwined relationships of his lenders and Chesapeake Energy, and the previously undisclosed terms under which McClendon's personal

loans were made.  Citing a February 2011 document detailing a meeting between McClendon's largest personal lender and a prospective investor, in addition to interviews with more than one dozen analysts, academics and attorneys who reviewed the loan agreements, the *Reuters* report noted that, among other things, "The size and nature of the loans raise concerns about whether McClendon's personal financial deals could compromise his fiduciary duty to Chesapeake investors."

34.    In addition to the previously undisclosed details about McClendon's personal loans, the *Reuters* report noted several other conflicts created by the loans, and in relevant part stated the following:

> Now, a series of previously undisclosed loans to McClendon could once again put Chesapeake's CEO and shareholders at odds.

> McClendon has borrowed as much as $1.1 billion in the last three years by pledging his stake in the company's oil and natural gas wells as collateral, documents reviewed by Reuters show.

> The loans were made through three companies controlled by McClendon that list Chesapeake's headquarters as their address. The money is being used to help finance what could be a lucrative perk of his job - the opportunity to buy into the very same well stakes that he is using as collateral for the borrowings.

> The size and nature of the loans raise concerns about whether McClendon's personal financial deals could compromise his fiduciary duty to Chesapeake investors, according to more than a dozen academics, analysts and attorneys who

reviewed the loan agreements for Reuters.

"If Mr. McClendon has $1 billion in debt through his own companies —
companies operating in the same industry as Chesapeake — he has or could have a
high degree of risk for conflicts of interest. As in, whose interest will he look out
for, his own or Chesapeake's?" said Joshua Fershee, an associate professor of
energy and corporate law at the University of North Dakota.

* * *

The loans portend a number of possible problems, the analysts said. McClendon's
biggest lender is simultaneously a major investor in two units of Chesapeake. That
connection raises questions about whether Chesapeake's own financing terms
could be influenced by its CEO's personal borrowing.

Another concern: A clause in the deals requires McClendon "to take all
commercially reasonable action" to ensure that other owners and operators of the
wells - including Chesapeake - "comply with…covenants and agreements" of the
loans. Such clauses are common in energy-finance deals. But it is rare for the CEO
of a major energy company to be personally subject to one involving the
corporation that he runs. That means McClendon could have an incentive to
influence Chesapeake to act in the interest of his lenders, rather than of his
shareholders.

"Basically what you have here is a private transaction that could potentially impact
a public company, depending on the manner in which the clause is interpreted and
applied," says Thomas O. Gorman, a partner at law firm Dorsey & Whitney in
Washington, D.C., and a former special trial counsel at the Securities and
Exchange Commission (SEC). "That may create a conflict of interest."

As a result, the loans should have been fully disclosed to Chesapeake shareholders, the academics, attorneys and analysts said.

* * *

Chesapeake's board of directors is aware that McClendon has borrowed against his share of company wells, [Chesapeake general counsel Henry] Hood said, but "the board did not review or approve the transactions." Nor did the company vet the loan terms for possible conflicts. "If there were any conflicts of interest," Hood said, "they would have surfaced by now."

Chesapeake board members contacted declined to comment. Marc Rome, Chesapeake's vice president for corporate governance, did not respond to requests for comment.

WELL INVESTMENT PLAN

The loans reveal how McClendon is using an unusual corporate incentive as collateral. The perk, known as the Founder Well Participation Plan, grants Chesapeake's billionaire co-founder a 2.5 percent stake in the profits - and makes him pay 2.5 percent of the costs - of every well drilled during each year he decides to participate.

Today, Chesapeake is the only large publicly traded energy company to grant its CEO the opportunity to take a direct stake in wells it drills. Chesapeake says the well plan is a uniquely powerful incentive because it aligns McClendon's personal

interests with those of the company's.

The well plan does not allow McClendon to select the wells in which to invest; Chesapeake says the program is an all-or-nothing proposition so that McClendon can't cherry-pick only the most profitable wells.

"He has to eat his own cooking here," said company spokesman Michael Kehs.

But because McClendon is using the loans to finance his participation in the well plan, he defrays his risks. Two of McClendon's lenders, both private equity firms, in turn spread the loan risks to other investors by raising money from state pension funds and other investors to fund them. Those insights emerge from a February 2011 document detailing a meeting between McClendon's largest personal lender and a prospective investor.

"If he hasn't had to put up any of his own money, how is that alignment" of McClendon and Chesapeake's interests, asked Mark Hanson, an analyst with Morningstar in Chicago.

Chesapeake said McClendon's loans are "well disclosed" to company shareholders. General Counsel Hood cited two references in the company's 2011 proxy. In them, the firm refers to McClendon's personal "financing transactions," including one in a section entitled "Engineering Support" that discusses McClendon's use of Chesapeake engineers to assess well reserves.

Nowhere in Chesapeake proxy statements or SEC filings does the company disclose the number, amounts, or terms of McClendon's loans. Veteran analysts of the company said they were never aware of the loans until contacted for this

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

article.

"We believe the disclosures made by the company have been appropriate under the circumstances, particularly since the disclosure of the loans is not required in any event," Hood said in a statement.

THROUGH THE CRACKS

Legal experts say the size and terms of McClendon's borrowing are unusual - and highlight a gap in regulatory scrutiny of American corporate executives.

\* \* \*

In September 2006, the SEC revised its related-party transaction rules to require companies to disclose when executives pledged corporate stock as collateral for loans. "These circumstances have the potential to influence management's performance and decisions," the SEC wrote.

McClendon's loans - backed not by stock but by stakes in company wells - aren't covered by the SEC rule. "Because they have decided to compensate him with a business interest, it kind of falls through the cracks," says Francine McKenna, an accounting expert and author of the accounting-related blog re: The Auditors.

As a result, no SEC regulation precludes McClendon from using his well plan stake as loan collateral. The SEC declined to comment on the McClendon loans.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

UNTANGLED

Key aspects of McClendon's loans remain hidden from shareholders. Because promissory notes underpinning the loan agreements are private, the interest rate, the exact amount borrowed and other terms of the transactions are not publicly known.

But the loan agreements demonstrate the extent to which McClendon has leveraged his interests: He has pledged as collateral almost every asset associated with his share of Chesapeake wells. Oil, gas and land interests, platforms, wells and pipelines, hedging contracts, geological and business data, and intellectual property are among scores of well-related assets that can be seized should McClendon default.

* * *

Given the size, scope and complicated terms of the loans, their particulars constitute important stockholder information and therefore should be more fully disclosed, said David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business.

Some shareholders agree. "While recognizing (McClendon's) right to privacy, the more information the company releases to shareholders the better - particularly when it's such a large amount of money and related to the oil and gas business," said Mike Breard, oil and gas research analyst at Hodges Capital Management in Dallas, which owns Chesapeake shares.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

LOAN TRAIL

As with a mortgage on a residential home, state law requires that ownership rights to physical property be recorded with county clerks.

Reuters found McClendon's loan agreements by following the trail of well and land lease transfers from Chesapeake to three companies that list McClendon as their corporate representative, according to state deed records.

In county courts in Louisiana, Texas, Arkansas, Pennsylvania and Oklahoma, where Chesapeake operates thousands of wells, the company regularly files a form called a conveyance. In keeping with the corporation's well participation program, the conveyance grants McClendon a 2.5 percent share of each well and of the leased land on which it is drilled.

For years, Chesapeake has distributed 2.5 percent shares in wells and land to three McClendon-controlled companies - Chesapeake Investments LP, Larchmont Resources LLC and Jamestown Resources LLC.

Since he co-founded Chesapeake in 1989, McClendon has frequently borrowed money on a smaller scale by pledging his share of company wells as collateral. Records filed in Oklahoma in 1992 show a $2.9 million loan taken out by Chesapeake Investments, a company that McClendon runs. And in a statement, Chesapeake said McClendon's securing of such loans has been "commonplace" during the past 20 years.

But in the last three years, the terms and size of the loans have changed substantially. During that period, he has borrowed as much as $1.1 billion - an

amount that coincidentally matches Forbes magazine's estimate of McClendon's net worth.

The $1.1 billion in loans during the past three years breaks down this way:

In June 2009, McClendon agreed to borrow up to $225 million from Union Bank, a California lender, pledging his share of wells as collateral.

In December 2010, he borrowed $375 million from TCW Asset Management, a private equity firm.

And in January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners, a private equity firm formed by former TCW executives.

It is unclear how much, if any, of those loans have been repaid.

Randall Osterberg, a senior vice president at Union Bank who signed the loan agreement, declined to comment. TCW and EIG also declined to respond to questions.

* * *

BIG LENDER

McClendon's biggest personal lender, EIG, has been a big financer for Chesapeake,

too.

In November, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in a newly formed entity, Chesapeake Utica LLC, which controls about 800,000 acres of oil and gas-rich land in Ohio. The sale offers lucrative terms to EIG investors, paying an annual dividend of 7 percent and royalty interests from oil and gas wells, according to analysts.

On April 9, the company announced a nearly identical deal to raise another $1.25 billion from EIG and other investors, in another new subsidiary called CHK Cleveland Tonkawa.

Dividends on preferred shares are controversial because they are paid before regular dividends owed to common shareholders. "Basically it's a form of more expensive debt," Morningstar's Hanson said. "It makes it appear that it's not debt, but it sits on top of obligations to the common shareholder."

The fact that McClendon's largest personal lender received favorable terms on its Chesapeake investments caused some Wall Street analysts to call for more information about McClendon's loans.

"I think the company should disclose this information. One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing to Chesapeake," said Joseph Allman, oil and gas industry analyst at JPMorgan in New York, who reviewed the loan agreements. "In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Chesapeake's Hood acknowledged there could be "some theoretical possibility of a conflict of interest" with the company and its CEO borrowing from the same lender. But because Chesapeake does not believe there is "an actual conflict of interest," more disclosure is not required, Hood said.

CLOSING A GAP

McClendon's personal loans highlight a gap in current SEC rules governing disclosures of related-party transactions, say accounting experts. The SEC requires disclosure of any transaction over $120,000 involving a company and a related party, such as the CEO, directors and certain family members, "with direct or indirect material interest."

Chesapeake said the SEC's related-party rule doesn't apply to McClendon's loans - only to his participation in the well plan. That's because Chesapeake believes the loans "do not constitute a material transaction with Chesapeake or even involve Chesapeake," Hood said.

That disclosure gap may be closing. A proposed new standard, released for public comment by the Public Company Accounting Oversight Board on February 28, would require auditors to identify and evaluate "significant unusual transactions" with executives connected to publicly traded firms. The board defined such transactions as those "outside the normal course of business or that otherwise appear to be unusual due to their timing, size or nature."

\* \* \*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26

35.    The same day that the *Reuters* report was published, April 18, 2012, an article published by *Forbes* noted many of the same conflicts created by McClendon's personal borrowing that were discussed in the Reuters report.  In addition, the Forbes article, titled "*Why Chesapeake Shareholders Should Worry About McClendon's Big Borrowing*," noted that by taking these huge loans McClendon "has been competing directly against his own company for access to capital markets," during a difficult financial period for his Company which is struggling under high debt and falling prices for natural gas:

Why Chesapeake Shareholders Should Worry About McClendon's Big Borrowing

Wednesday, in a story from Reuters, came revelations that Aubrey McClendon, chief executive of Chesapeake Energy, had borrowed more than $1.1 billion against his personal stakes in oil and gas wells controlled by Chesapeake.

The size of the loans is pretty shocking (equal to more than one-tenth of Chesapeake's total long-term debt), as is the clear and undeniable implication that McClendon is up to his eyeballs in conflicts that should lead every shareholder to question whether he has their interests or his own at heart. At one point on Wednesday investors drove down Chesapeake shares more than 10%. They closed down 5.5% on Wednesday, and have fallen by half since last August, hammered by debt loads and low natural gas prices

Here is the core of what is wrong with McClendon's massive borrowing: Chesapeake is severely capital constrained (a result of high debt loads, reckless spending on ever more shale gas acreage and rock bottom natural gas prices) to the point that the company is trying to sell billions of dollars in assets this year to make ends meet. At the same time this is going on, McClendon has been competing directly against his own company for access to the capital markets in order to shore up his own finances — without telling shareholders the extent of his financings.

Doesn't he owe it to shareholders to put their capital needs ahead of his own? Shouldn't shareholders know that the ceo of their company has found someone to lend him $1.1 billion against assets that they co-own with him? That's an amount

of money that is certainly material to a company with an equity market cap of $12 billion and debt load of $10 billion. This is an obvious conflict of interest, insufficiently disclosed, that should not be allowed to continue.

(Chesapeake, in its response to the revelations, insists that there's no conflict, that the amounts of the loans are not material, that the company knew about the size of the loans, but that the board of directors neither approved the loans nor has any business overseeing McClendon's personal transactions covering his personal assets.)

Key to these loans is a sweetheart perk through which Chesapeake gives McClendon the opportunity to buy a 2.5% stake in every well the company drills (more than 2,000 this year). The Reuters story revealed that McClendon has borrowed heavily against these well stakes, gleaning cash from investors including EIG Global Energy Holdings, a private equity group that helped finance Chesapeake's recent foray into Ohio's Utica Shale. EIG's deal with McClendon guaranteed them 100% of the revenues from McClendon's well stakes until EIG had achieved a 13% return on investment. What's more, according to Reuters, after the principal is paid off, EIG gets a 42% share of production from those wells, in perpetuity.

Now sharp-penciled analysts and investors have known for years that McClendon has borrowed against or sold portions of his stakes in Chesapeake wells — there's some blanket disclosures in the company's proxy filings and after McClendon's infamous 2008 financial meltdown the company agreed to front the CEO $75 million to pay his share of drilling costs. McClendon has raised millions more by selling interests in his wells to a variety of investors through vehicles known as volumetric production payments, or VPPs. But $1.1 billion is in a different ballpark.

And it's not just this $1.1 billion in loans. I've also learned today that McClendon has entered into two private transactions called volumetric production payments, whereby he has collected more than $130 million upfront from banks and investors in return for delivering to them set amounts of gas from his wells for a certain period of time (in effect he's sold them a temporary overriding interest). Though Chesapeake's most recent proxy filing mentions that McClendon has done such VPPs, the deals were not announced at the time they were done, nor were the dollar values.

So how does this happen at all? McClendon has one of the best perks in the entire oil and gas industry. Every time Chesapeake drills a well across its millions of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

28

acres, McClendon gets a 2.5% stake in it. He has to pay a pro-rated share of the capital costs and expenses that go into those wells, but after that, 2.5% of the oil and gas coming out of that well, and 2.5% of the reserves down in the ground are his, free and clear.

Chesapeake and McClendon insist that this Founders Well Participation Program aligns his interests with those of shareholders. Their reasoning is that because McClendon has a piece of each well, he'll want to make decisions that profit himself, not just the company. Sounds plausible, but it doesn't hold up.

The simple truth is that McClendon's well participation perk does not align his interests with those of shareholders. As I detailed in my cover story on McClendon last fall, at the heart of Chesapeake's operation is the land machine, which scoops up promising acreage across America, paying billions to secure the rights to drill. Much of that land turns out to have oil and gas; some doesn't. When land turns out not to be worth drilling, the millions sunk into accumulating it is lost.

Chesapeake only drills wells on land where it has a good belief that there's oil and gas to be had. It drills more wells in the choicest parts of a field. McClendon only participates in the good acreage; he doesn't get docked for the bad acreage Chesapeake has no use for. Thus he is absolutely guaranteed to get better opportunities and better returns than Chesapeake's shareholders. He shares in the boons and avoids the banes.


Not that it's done him much good. Chesapeake's most recent proxy filing sets out the financial performance underlying McClendon's FWPP interests. In 2010 he received revenues from oil and gas sales of $127 million, but had to put up $268 million for his share of well costs and capital expenditures. That yielded a net capital loss of $142 million. This was worse than his $116 million loss in 2009 and his $63 million loss in 2008 (that was the year that he lost his fortune in Chesapeake shares after a margin call wiped him out). Gas prices have only been going down, so it's likely that his last year's FWPP losses were the worst ever. No wonder he needs a loan.

Now if McClendon's prime slice of the Chesapeake pie is doing this poorly, it means the core oil and gas business underlying Chesapeake is just as bad, or worse. You can see it in their years of financial statements. The company doesn't generate any free cash flow from operations; it's only by playing the land game — acquiring acreage cheap and selling it at a premium to big, multinational companies

like BHP Billiton, Cnooc or Total — that McClendon has kept the business going. That, plus taking on $10 billion in debt.

But McClendon is in a pickle right now. Natural gas, hovering around $2 per mmBTU, is cheaper than it's been in a decade. Much of the shale gas supply boom is due to McClendon's boundless optimism in always trying to be the first ones in to a big new play. The better he's gotten at finding gas, the cheaper it's become. Chesapeake is becoming a victim of its own success.

I've spoken to many in this industry who admire McClendon for what he's built, for his vision, his gumption. But some of those same people lament that McClendon will never be able to regain their trust. Chesapeake shares are lower than they've been since 2009; $12 billion in equity market cap is overwhelmed by $10 billion in debt and billions more in preferred stock and VPP obligations. McClendon, with less than $75 million in Chesapeake shares is not in an unassailable position. A big enough hedge fund could force him out and carve up the assets, if it had the guts to see what other surprises McClendon might be hiding.

The big boys like ExxonMobil or BP can afford to keep pumping natgas no matter how cheap it gets. Seeing Chesapeake get crushed in the process would only create opportunity for the cash-rich giants to pick the best chunks off of Chesapeake's carcass.

What's Chesapeake's response to all this? Well, in a very unusual move, Chesapeake emailed me the entire written Q&A between General Counsel Henry Hood and Reuters reporters. And later in the day they published the whole thing on their website.

Reuters asks some excellent questions, most of which Hood manages to dodge with artful legal rationalizations or statements such as: "Any loans are Mr. McClendon's personal business and not appropriate for review or monitoring by the company or for public comment."

McClendon owes shareholders his own set of responses to these questions as well as a pledge that in the future he'll err on the side of more disclosure rather than none. And though he's got too big an ego to voluntarily give up his well participation perk, if his board of directors have any sense they'll end the practice, just to end the appearance of conflict of interest and to start rebuilding investors' trust.

36.    On April 18, 2012, Chesapeake issued a statement over *Business Wire* through its

general counsel, Henry J. Hood, stating that the Company's directors were fully aware of the

existence of McClendon's financing transactions:

> OKLAHOMA CITY, Apr 18, 2012 (BUSINESS WIRE) -- Chesapeake Energy Corporation General Counsel Henry J. Hood issued the following statement in response to recently published media reports: "The Founders Well Participation Program (FWPP) has been in place since the company's founding and was reapproved by shareholders by a wide margin in 2005. The terms and procedures for the program are clear and detailed in every proxy for all shareholders to see. Mr. McClendon's interests and Chesapeake's are completely aligned. In addition, there are numerous third-party participants in the company's wells, including some of the largest energy companies in the world, that monitor the actions of the company through a number of processes, including well audits, reporting, governmental filings and hearings, participation in development plans and marketing of production. The suggestion of any conflicts of interest is unfounded."

> Hood also added, "The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions and the fact that these occur is disclosed in the proxy. Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy. The FWPP fully aligns the interests of Mr. McClendon with the company and the Board of Directors supports this program as does the majority of its shareholders."

37.    Additionally, an April 19, 2012 *Wall Street Journal* article entitled "For Chesapeake's CEO, A Complex Web of Loans" reported the following:

> Firms controlled by Aubrey McClendon, the high-profile founder and chief executive of Chesapeake Energy Corp., were in debt to a private equity group for as much as $1.4 billion while Chesapeake was negotiating with the same firm to sell it hundreds of millions of dollars of assets.

> WSJ's Liam Denning makes a stop on Mean Street with an update on Chesapeake Energy. Its stock price fell more than 10% this week after CEO Aubrey McClendon reportedly took more than $1 billion in loans secured on interest in Chesapeake wells.

> According to documents reviewed by The Wall Street Journal and a person familiar with the matter, an entity created by Mr. McClendon received a loan of up

to $1 billion from an affiliate of EIG Global Energy Partners last November, on top of an earlier loan of $375 million. The November loan was to Jamestown Resources LLC, which lists Mr. McClendon as president and shares an address with Chesapeake in Oklahoma City, Okla.

Earlier in November, EIG bought $500 million in Chesapeake assets and in December led a group of private firms that bought an additional $750 million, the company announced at the time. Earlier this month, EIG was again part of a private-equity group that purchased a stake in a Chesapeake subsidiary for $1.25 billion.

Mr. McClendon used loans from EIG to pay for his participation in a controversial company program that gives him the right to benefit from every oil and gas well Chesapeake drills, but requires him to contribute to the well costs, according to people familiar with the matter. Chesapeake, the second-largest gas producer in the U.S., has had to raise billions of dollars recently as the price of gas has plunged because there is a glut of the fuel.

The existence of the loans was first reported last month by the Pittsburgh Post-Gazette and then on Wednesday by Reuters.

News of the loans, and the fact that they were made by a private-equity firm that was also doing deals with Chesapeake, has raised concerns with shareholders about how well the company is monitoring and disclosing the financial activities of Mr. McClendon.

"This sounds like a major conflict of interest," says Michael Passoff, chief executive of Proxy Impact, which advises institutions on shareholder votes.

Mr. McClendon didn't respond to questions from The Wall Street Journal, but the company says there was no conflict of interest. Mr. McClendon didn't participate in the company's negotiations with EIG, though he signed off on the transactions, the company said.

Chesapeake also said it didn't have to disclose details of loans. "He had separate counsel negotiating the terms of his own financing transactions," Henry Hood, the company's general counsel, said in a statement, adding that the board was aware of Mr. McClendon's companies' transactions.

Members of Chesapeake's board declined to comment, didn't return calls seeking comment or, in one case, couldn't be reached.

Chesapeake's shares have fallen 43.5% in the last year, including a 5.5% drop Wednesday to $18.06. The stock peaked in June 2008 at just under $70 a share. The company has been struggling with natural gas prices that have sunk to their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

lowest level in a decade, down 55% in the last year, and says it has cut back its gas-drilling to shift its rigs to more profitable oil fields.

Mr. McClendon's limited liability companies obtained loans of up to $1.375 billion from EIG and a predecessor firm, TCW Asset Management Co., starting in 2010, according to public records filed in Texas and Pennsylvania. The financing package was modified in November 2011, and a mortgage was amended earlier this year to include more properties. Mr. McClendon pledged as collateral his minority interests in thousands of wells that Chesapeake drills.

Chesapeake says Mr. McClendon's right to purchase a 2.5% interest in every well the company drills helps align his interests with shareholders. In late 2008 the company awarded him $75 million to invest in the program.

But the program has ballooned. In 1994, the first full year of the "Founders Well Participation Program," the company drilled only 18 wells. Today, the company is the most active driller in the U.S., operating twice as many land rigs as Exxon Mobil Corp., its nearest competitor, and drilling more than 1,000 wells a year.

Mr. McClendon paid $242 million in 2010 to cover his costs of drilling those wells, according to company filings with securities regulators.

As the cost of participating has grown, Mr. McClendon turned to private equity groups to help cover his payments, with his 2.5% interest in the Chesapeake wells serving as collateral. EIG, in a meeting with the New Mexico State Investment Council in February 2011 and first cited by Reuters, said it collected all his revenue from the wells until it achieved a 13% annualized return, then takes 42% of the profit. The other 58% belongs to Mr. McClendon. The remaining 97.5% of revenue from the wells remains with Chesapeake and any partners it may have.

Chesapeake's sale of assets in the Utica Shale to EIG last November are part of its continuing effort to raise at least $10 billion to fund its drilling program and pay down debt.

Mark Hanson, an analyst for Morningstar, said he thought that one deal, in which Chesapeake sold Utica acreage to EIG, was an expensive way to secure financing, but thought it made sense because the field was unproven.

But informed of Mr. McClendon's private deal with EIG, he said he would have some doubts about whether there was a quid pro quo.

This isn't the first time Mr. McClendon has attracted attention for his finances. Last November, as part of a settlement with shareholders, he agreed to buy back, with interest, a collection of 500 antique maps he sold to Chesapeake in 2008 for $12.1 million.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In October 2008, Mr. McClendon had to sell most of his 5.8% stake in the company after a falling stock price led to margin calls. Today he owns less than 1% of the company's shares.

Analysts and investors have criticized Chesapeake's compensation practices, which before this year weren't based on set performance metrics. Last year, 58% of votes cast favored Chesapeake's executive pay practices. Mr. McClendon was re-elected with 78% of the vote, down from the more than 96% support he received in 2008.

Renewed controversy over Mr. McClendon could widen shareholder support for efforts to make it easier for major investors to nominate independent directors to the board. New York City's five employee pension funds are pushing a so-called "proxy access" resolution at this year's annual meeting, expected in June.

Shareholders "need directors who will protect our interests, not those of a self-interested CEO," said Michael Garland, executive director for corporate governance for New York City Comptroller John Liu, who oversees the pension funds. "It's the latest example of a board that has repeatedly shown itself incapable of exercising independent oversight."

38.    A May 1, 2012 *AP* article entitled "Chesapeake's McClendon to Give Up Chairman Post" reported the following:

NEW YORK (AP) — Chesapeake Energy founder Aubrey McClendon was stripped of his chairmanship role Tuesday following shareholder complaints that his personal business interests could conflict with those of the company he runs.

McClendon will remain CEO. The company's board said it's searching for an independent chairman.

The board has been feeling the heat from shareholders after reports surfaced that McClendon took out more than $1 billion in loans to pay for his stake in the company's wells. He was allowed to buy those stakes as a part of his compensation program, a perk that had long raised concerns from shareholders.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34

Some of the loans came from a group that was also planning to buy Chesapeake assets. Investors said McClendon's private dealings with the group could have influenced Chesapeake's decision to sell those assets.

The company said Friday it will end the investment program in 2014, 18 months ahead of schedule, to "eliminate a source of controversy." The moves were welcomed by Chesapeake's largest shareholder.

"Aubrey was right to recognize that these actions are in the best interests of the company and its shareholders," said O. Mason Hawkins, chairman and CEO of Southeastern Asset Management, which holds a 13.2 percent stake.

McClendon, 52, spent most of his adult life searching for natural gas and oil in the U.S. He co-founded Chesapeake in 1989, turning an initial $50,000 investment into America's second-largest natural gas producer behind Exxon Mobil Corp.

His success brought a flood of prestige and significant wealth. He was America's top-paid CEO in 2008, receiving compensation worth $112.5 million. He established himself as a leading spokesman for the benefits of natural gas. And he became a part owner of the NBA's Oklahoma City Thunder.

The petroleum business, however, is notorious for booms and busts. Sometimes within the same year. McClendon hasn't been immune.

When natural gas prices plunged in 2008, it created huge financial hardship for Chesapeake's investors, including McClendon. The company's stock tumbled 60 percent and McClendon was forced to sell $550 million of stock to cover bank demands for repayment of loans.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Chesapeake's board softened the blow by granting McClendon a $75 million bonus at the end of 2008. The company said the money was meant to help McClendon pay for his share of the well costs. Chesapeake also paid McClendon $12 million that year for his personal collection of antique maps. McClendon has agreed to buy back the maps, with interest, but the deal isn't yet final.

McClendon received a pay package worth $17.9 million in 2011.

Since he started Chesapeake, McClendon has had broad authority to run the company, and to compensate himself in the process. As board chairman, he supervises the advisory group that hires and fires executives, approves their compensation packages, and advises the management. As CEO, he oversees the company's daily operations.

Just last month, Chesapeake said in a regulatory filing that having one person as chairman and CEO provides "clear lines of accountability." Besides, the company added, "McClendon brings unparalleled knowledge and experience, as well as an intimate understanding of the company's operations and culture, to the roles of chairman and CEO."

Many of the biggest energy companies have similar setups. Exxon's Rex Tillerson and Chevron Corp.'s John Watson hold both titles.

By splitting the roles, however, Chesapeake gets rid of some obvious conflicts, said Charles Elson, a University of Delaware expert on corporate governance.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"It's a wise move," Elson said. "It doesn't make much sense for a CEO to be in charge of the organization that's supposed to be monitoring him."

Wall Street cheered the decision — briefly. Chesapeake shares gained more than 6 percent in regular trading. But they more than 5 percent in after-hours trading when the company reported adjusted earnings of 18 cents per share for the first quarter. Analysts were expecting earnings of 28 cents per share in the quarter.

They're still down about 12 percent for the year because of a plunge in natural gas prices and concerns about the company's huge debt load.

The board of directors said candidates for the non-executive chairman's position will have "no previous substantive relationship with Chesapeake."

"I am completely supportive of the board's plans," McClendon said in a statement. The actions will "enable me to focus my full time and attention on execution of the company's strategy."

McClendon puts the principal amount of the loans at $846 million.

The board is reviewing McClendon's loans. The Internal Revenue Service also is looking at the well-investment program.

39.      The loans exposed Chesapeake and McClendon to charges of impropriety and conflicts of interest.   One of the companies through which McClendon received the loans was

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

EIG Global Energy Partners LP, which participated in a $1.25 billion preferred stock offering of a Chesapeake subsidiary in 2011.  McClendon's debt to EIG Global Energy raises doubts and suspicions as to whether the terms under which EIG Global Energy participated in the underwriting were achieved at arms' length and on the best possible terms for Chesapeake.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

40.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

41.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

42.     Plaintiff is the owner of Chesapeake Energy common stock and was the owner of Chesapeake Energy common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

43.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants McClendon, Davidson, Eisenbrenner, Hargis, Keating, Maxwell, Miller, Nickles, and Simpson.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

44.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

### A.     Demand Is Excused Because the Board's Conduct Is Not a Valid Exercise of Business Judgment

45.     As the ultimate decision-making body of the Company, the Board affirmatively adopted and condoned McClendon's deliberate breaches of his fiduciary duties.  Allowing such breaches is not a legally protected business decision, and such conduct is not considered a valid exercise of business judgment.  Defendants also knowingly, in reckless disregard of their fiduciary duties, or at a minimum with gross negligence, participated in the misrepresenting the Company's business and operations by failing to require full disclosure of the terms and conditions of McClendon's personal loans.  Accordingly, demand on the Board is excused.

46.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which Defendants face potential personal liability.  Violations of the law, approving violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are forms of misconduct and not legitimate business conduct.  The protections of the "business judgment rule" do not extend to such malfeasance.  Nor can such malfeasance ever constitute the "good faith" required of

corporate fiduciaries.

47.     Moreover, each member of the Board directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning the Company's financial arrangements and the adequacy of the Company's internal controls. For the reasons stated herein, the Board knew or should have known the conflicts of interest created by McClendon's personal loans from certain of the same lenders financing Chesapeake Energy's operations. In addition, when deciding whether to sign or approve statements to be publicly disseminated, the Board was also bound by their duty of care to inform themselves of all reasonably available material information. The lenders, terms and extent of McClendon's personal borrowing were reasonably available to the Board and material to the Company's shareholders.

48.     The Board's tacit or express approval of the Company's misrepresentations and omissions concerning McClendon's personal loans and Chesapeake Energy's financing arrangements with some of the same lenders, and the Board's participation in the dissemination of improper public statements which failed to disclose the full extent of these conflicts of interest, cannot be regarded as a valid exercise of business judgment.

**B.      Demand Is Excused Because a Majority of the Board**

        <u>**Faces a Substantial Likelihood of Liability**</u>

49.     Even if knowingly presiding over multiple breaches of fiduciary duties could somehow fall within the ambit of the business judgment rule (which it does not), demand is also

futile and excused because a majority of the Board is not disinterested because they face a substantial likelihood of liability for their conduct.

50.     Every member of the Board was aware of, or should have been aware that the McClendon's personal borrowing would create a major conflict between his financial interests and the Company's shareholders, in addition to the adverse publicity caused by disclosure of these issues.  Despite clearly being placed on notice of these issues, every member of the Board consciously disregarded their fiduciary duties to Chesapeake Energy when, under their direction, the Company failed to fully disclose the conflicts created by McClendon's personal loans and the Company's own financial arrangements.  Accordingly, the entire Board faces a substantial likelihood of liability for ignoring these problems.  Thus, demand is excused.

51.     Finally, every member of the Board is required to comply with the Code of Conduct.  The Code of Business Conduct and Ethics states:

> All directors, officers and employees of the Company must avoid situations that create a conflict of interest or the appearance or potential for a conflict of interest.

52.     Each member of the Board permitted the McClendon and the Company to engage in the misconduct described above, thereby abdicating their fiduciary duties to the Company, and severely damaging the Company.  Therefore, every member of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties, and any demand upon them is futile.

53.     The entire Board and senior management participated in the wrongs complained of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

41

herein.  For the reasons described herein, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above-referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability**.**

### C.     <u>Other Reasons Demand is Excused</u>

54.     The principal professional occupation of defendant McClendon is his employment with Chesapeake Energy as Chairman and Chief Executive Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, Defendant McClendon certified certain of the Company's SEC filings.  Accordingly, demand is futile as McClendon faces a substantial likelihood of liability for breach of fiduciary duties owed to the Company.  Thus, as the Company's CEO, defendant McClendon is not an independent director capable of impartially considering a demand to commence and vigorously prosecute this action, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  McClendon, moreover, has dominated the Board for years and continues to do so by electing to place his own personal interests over those of the Company.

55.     In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.  Specifically, Davidson, Hargis, Keating, Maxwell, Miller, and Nickles were on the Board when the Board authorized the Company to purchase from McClendon a $12.1 million map collection.  This decision to approve the purchase of the map collection was not a valid exercise of business judgment and demonstrates that Davidson, Hargis, Keating, Maxwell, Miller, and Nickles were personally beholden to McClendon and sought to assist McClendon financially to the detriment of the Company.  Additionally, defendant Miller is Chairman, President, and CEO of National Oilwell Varco, Inc. ("National"), a supplier of oilfield services, equipment, and components to the oil and natural gas industry.  The Company, moreover, has had a business relationship with National through National's purchase of oil field equipment and services from the Company on numerous occasions.  Accordingly, because of this business relationship, Miller cannot impartially consider a demand.

56.     Defendants Davidson, Hargis, and Miller are members of the Audit Committee. The Company's Audit Committee is responsible for, among other things: (1) reviewing insider and affiliated party transactions and related disclosures; and (2) determining whether related party transactions are not inconsistent with the best interests of the Company's shareholders. Nonetheless, the Audit Committee failed to manage the business and financial risk caused by the repeated and egregious insider and related transactions that clearly created the need for an inquiry into potential conflicts of interest and disclosure.  Hargis, who has served as the Vice Chairman of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

43

BOKF Financial Corporation, the holding company that operates Bank of Oklahoma, and Miller, who served as the President, Chief Operating Officer, and CEO of National Oilwell Varco, Inc., both knew of the importance of supervision and monitoring of a Company's business and financial risks. Nevertheless, Miller and Hargis failed to exercise their fiduciary duties in to supervise and monitor with respect to Chesapeake. By such actions, defendants Davidson, Hargis, and Miller breached their duties by failing to sufficiently monitor the Company's business and financial risks and, accordingly, any demand upon them is futile.

57.     Demand is also futile because members of the Company's Compensation Committee cannot fairly evaluate a demand. The Compensation Committee is currently comprised of defendants Eisbrenner, Keating, and Maxwell. The Compensation Committee's purpose is to ensure that executive compensation is aligned with the short-term and long-term interests of the Company's shareholders. Not only did the Compensation Committee utterly fail in this purpose, but, in the wake of the major scandal and litigation following the controversial $75 million payment to McClendon and $12.1 million antique map collection purchase, the Compensation Committee presided over a compensation system under which McClendon was responsible for establishing components of his own compensation. Additionally, the Compensation Committee completely failed to ensure even the appearance of CEO compensation aligned with shareholder interests as demonstrated by the following: (1) under McClendon's financing agreements, his income from his well interests under the FWPP

was being used to service the loans, and the interest was being used as collateral for the loans.  As a result, McClendon must keep the wells productive at all costs in order to earn the income needed to make his payments.  This interest is clearly in conflict with the interests of shareholders which would require that in some instances wells need to be capped, especially in light of the glut of natural gas presently taking place due to the shale boom; (2) also due to the loans McClendon has taken out under the FWPP, he has been competing directly against his own Company for access to the capital markets without revealing to shareholders that he was doing so; and (3) a large portion of Chesapeake's business is purchasing acreage across the country with potential for natural gas drilling and paying billions to secure the rights to drill.  Some of the acreage eventually is drilled upon, and much of the land turns out not to be worth drilling.  Because the Company only drills on land that it has a strong belief will be productive of oil and gas, McClendon only participates in the good acreage and does not pay for acreage that is never drilled.  As a result, he is guaranteed to achieve a better return than the Company's shareholders because he shares in the good wells while the Company and shareholders front the cost obtaining the land and determining. It is therefore clear that the Compensation Committee has completely failed to institute a compensation system that aligns the CEO's interests with those of the shareholders. Accordingly, demand on defendants Eisbrenner, Keating, and Maxwell is futile.

58.    Demand is also futile because defendants Nickles and Simpson – as members of the Company's Nominating and Corporate Governance Committee –

cannot fairly evaluate a demand.  According to the Nominating and Corporate Governance Committee Charter, members of this Committee are responsible for, among other things: (1) developing, reviewing, and recommending corporate governance principles and making recommendations to the Board regarding governance matters and practices; (2) overseeing the annual evaluation of the performance and effectiveness of the Board and its committees; and (3) overseeing and evaluating compliance by the Board and management with the Company's corporate guidance principles and its Code of Business Conduct and Ethics.  Despite these responsibilities, members of the Nominating and Corporate Governance Committee failed to oversee the development and instruction of a system of corporate governance that would prevent the conflicts of interest alleged herein.  Because of such failure, defendants Nickles and Simpson breached their duties by failing to sufficiently monitor the Company's business and financial risks and, accordingly, any demand upon them is futile.

59.    Demand is also excused because members of the Board – and particularly McClendon – have received extraordinary compensation and benefits as directors that render demand against them futile.  For example: (1) during 2011 and 2010, Davidson received a total of approximately $590,426 and $620,438, respectively, from the Company; (2) during 2011 and 2010, Eisbrenner received a total of approximately $561,805 and $248,670, respectively, from the Company; (3) during 2011 and 2010, Hargis received a total of approximately $565,465 and $580 ,251, respectively, from the Company; (4) during 2011 and 2010, Keating received a total of

approximately $559,232 and $623,443, respectively, from the Company; (5) during 2011 and 2010, Maxwell received a total of approximately $386,273 and $467,028, respectively, from the Company; (6) during 2011 and 2010, Miller earned a total of approximately $386,273 and $467,028, respectively, from the Company; (7) during 2011 and 2010, Nickles earned a total of approximately $569,341 and $590,316, respectively, from the Company; and (8) during 2011, Simpson earned total of approximately $647,738 from the Company.  Additionally, each non-employee director is permitted to use the Company's aircraft for up to 40 hours of flight time per year, in addition to transit to and from Company functions.

60.     The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification.

61.     Each of the Individual Defendants authorized and/or permitted the breaches of fiduciary duties and/or misleading statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and thus could not fairly and fully prosecute such a suit even if they instituted it.

62.     Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of law that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

63.     The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby.

64.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

65.     Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons: (1) Chesapeake Energy is a publicly held company, with more than 662 million shares outstanding as of February 22, 2012, and thousands of shareholders; (2) making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and (3) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66.     Furthermore, the conduct alleged herein could not have been the product of good-faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.

## COUNT I

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)**

67.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

68.     The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable laws.  The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

69.     The Individual Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules and regulations.

70.     As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

71.     Each of the Individual Defendants' acts in causing or permitting the Company to

disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.

## COUNT II

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

72.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

73.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

74.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the

Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT III

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR

### CONTRIBUTION AND INDEMIFICATION)

75.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

76.     The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

77.     The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants.   The Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT IV

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

79.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

80.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT V

## (AGAINST THE INDIVIDUAL DEFENDANTS FOR

## WASTE OF CORPORATE ASSETS)

81.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

82.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

83.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 2, 2012                    By: s/Steven W. Crow

                                                STEVEN W. CROW, OBA No. 15676

                                                5617 N. Classen Blvd.

                                                Oklahoma City, OK 73118

                                                Telephone: 405-843-0400

                                                Facsimile: 405-843-5005


                                                GLANCY BINKOW & GOLDBERG LLP

                                                LIONEL Z. GLANCY

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

53

MICHAEL GOLDBERG

EX KANO S. SAMS II

1925 Century Park East, Suite 2100

Los Angeles, California 90067

Telephone:       (310) 201-9150

Facsimile:       (310) 201-9160

*Counsel for Plaintiff*